IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| JOHNSON OUTDOORS INC., *et al.*, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | CASE NO. 2:10-CV-67-WKW [WO] |
| ) | |
| NAVICO, INC., ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiffs Johnson Outdoors, Inc. ("Johnson Outdoors") and Johnson Outdoors Marine Electronics, Inc., d/b/a Humminbird ("Humminbird" or collectively "Johnson Outdoors" or "Plaintiffs") bring this patent infringement action against Defendant Navico, Inc. ("Navico"). Johnson Outdoors alleges infringement of four patents generally related to boat-mounted side-scan sonar imaging devices. Among Navico's defenses are invalidity and inequitable conduct during the prosecution of one of the patents. On March 8, 2011, the court conducted a claim construction hearing with respect to the patents in suit. Upon consideration of the parties' arguments, claim construction briefs, and the evidence presented, the court construes the disputed claim term as set forth below.

## I. BACKGROUND

Johnson Outdoors filed a Third Amended Complaint (Third Am. Compl. (Doc. #45)), alleging patent infringement by Navico of four of Johnson Outdoors's patents relating to a "system, to be mounted to a boat, employing side scan sonar beams to locate fish and underwater structures, and to display them in detailed and recognizable images." (Third Am. Compl. ¶ 2.) These boat-mounted side scanning sonar imaging systems are sold by Johnson Outdoors under Humminbird's "Side Imaging" registered trademark.

The four Patents at issue all derive from U.S. Patent Application No. 11/195,107 (the "'107 Application"), which was filed on August 2, 2005. The first Patent to issue, U.S. Patent No. 7,652,952 (the "'952 Patent"), discloses and describes a "sonar imaging system compris[ing] a transducer coupled to the watercraft and having at least one side scanning element and at least one bottom scanning element, [and] an electronic control head unit coupled to the transducer and configured to display sonar images." ('952 Patent Abstract (Doc. # 71, Ex. A).) The next Patent to issue, U.S. Patent No. 7,710,825 (the "'825 Patent") describes the same system, but "further includ[es] signal processing circuitry . . . and a digital processor for providing signals . . . to produce a display image on the display showing boat location, a water column between the boat and the bottom, and an underwater image comprising at least one of a left side underwater image and a right side underwater image." ('825 Patent Abstract (Doc. # 71, Ex. B).) The third Patent to issue, U.S. Patent No. 7,729,203 (the "'203 Patent") describes the same system, but "includ[es] a GPS receiver for providing GPS position data[.]" ('203 Patent Abstract (Doc. #71, Ex. C).) The fourth Patent

to issue, U.S. Patent No. 7,755,974 (the "'974 Patent"), describes the same system but "further includes a user interface including user inputs and a display and a digital processor . . . to show an underwater image based upon the side scan image data, wherein the digital processor, in response to a user command, performs an image enhancement algorithm to enhance the underwater image."  ('974 Patent Abstract (Doc. # 71, Ex. D).)

Johnson Outdoors alleges that, after it had filed patent applications to protect its technology, Navico, with knowledge that the United States Patent and Trademark Office ("PTO") had determined that claims in the '107 Application were patentable[1], began to sell "its own side scan sonar products to compete directly with the Humminbird 'Side Imaging' products.  Navico calls these products its 'Lowrance LSS-1 StructureScan Imaging System' . . . ." (Third Am. Compl. ¶¶ 5-6.)  The Third Amended Complaint alleges, in four counts, that Navico, "by making, using, importing, offering to sell and/or selling" its Lowrance StructureScan Imaging System, infringed the patented technology of the '952, '825, '203, and '974 patents held by Johnson Outdoors.

Navico filed an Amended Answer (Am. Answer (Doc. # 51)), which included affirmative defenses and counterclaims seeking declarations of noninfringement, invalidity, and unenforceability of the four patents at issue.

At the *Markman* hearing, both parties presented well organized and persuasive arguments consistent with briefing (Docs. # 89, 90) concerning the "image" claim term.

---

[1] Johnson Outdoors claims priority to August 2, 2005, the date of the '107 Application.  (Third Am. Compl. ¶ 2.)

Both parties agree that construction of the claim term will have no impact on Johnson Outdoors's infringement claims, but that it will impact Navico's invalidity defenses as to the '952 and '203 Patents. (Doc. # 89, at 3; Doc. # 90, at 2.) Navico further argues that construction of the term "image" will also impact all of its other defenses against all four Patents. Satisfied that "image" is a claim term that is sufficiently in controversy, the court will construe the term. *See Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999) ("[O]nly those terms need be construed that are in controversy, and only to the extent necessary to resolve the controversy.").

## II. LEGAL STANDARD

### A. **Generally**

A patent confers the right to exclude others from making, using, or selling the invention defined by the patent's claims. *Standard Oil Co. v. Am. Cyanamid Co.*, 774 F.2d 448, 452 (Fed. Cir. 1985) (citing 35 U.S.C. § 154). A patent must describe the exact scope of an invention and its manufacture to secure to the patentee all to which he is entitled, and to apprise the public of what is still open to it. *Markman v. Westview Instruments*, 517 U.S. 370, 373 (1996). These objectives are served by two distinct elements of a patent document. First, the patent contains a specification describing the invention in such full, clear, concise, and exact terms as to enable any person skilled in the art to make and use the same. 35 U.S.C. § 112. Second, a patent includes one or more claims, which particularly point out and distinctly claim the subject matter which the applicant regards as his or her invention. *Id.*

Put simply, "[s]pecifications teach.  Claims claim." *SRI Int'l v. Matsushita Elec. Corp.*, 775 F.2d 1107, 1121 n.14 (Fed. Cir. 1985).

The first step in any assertion of infringement or invalidity is claim construction. *See Union Oil Co. of Cal. v. Atl. Richfield Co.*, 208 F.3d 989, 995 (Fed. Cir. 2000) (quoting *Rockwell Int'l Corp. v. United States*, 147 F.3d 1358, 1362 (Fed. Cir. 1998)).  "The construction of claims is simply a way of elaborating the normally terse claim language in order to understand and explain, but not to change, the scope of the claims." *Id.* (quotation omitted).  Claim construction is a matter of law to be decided exclusively by the court. *Markman*, 517 U.S. at 390.

"It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (*en banc*) (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)).  Specifically, it is the claim terms, the words employed within the claims, that define the scope of the patented invention. *Id.*; *see also Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). Claim terms "are generally given their ordinary and customary meaning." *Phillips*, 415 F.3d at 1312 (citing *Vitronics*, 90 F.3d at 1582).  "[T]he ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention[.]" *Phillips*, 415 F.3d at 1313 (citing *Innova*, 381 F.3d at 1116).

**B.      Intrinsic Evidence**

"There is a hierarchy for various types of intrinsic evidence." *Applied Signal Tech., Inc. v. Emerging Mkts. Commc'ns, Inc.*, No. 09cv2180, 2011 WL 500786, at *2 (N.D. Cal. Feb. 9, 2011). In descending order, this hierarchy is comprised of "'the words of the claims themselves, the remainder of the specification, [and] the prosecution history[.]'" *Phillips*, 415 F.3d at 1314 (quoting *Innova*, 381 F.3d at 1116). "When the intrinsic evidence is unambiguous, it is improper for the Court to rely on extrinsic evidence[.]" *Applied Signal Tech.*, 2011 WL 500786, at *2.

"In some cases, the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." *Phillips*, 415 F.3d at 1314. However, "the meaning of a claim term as understood by persons of skill in the art is often not immediately apparent[.]" *Id.* In such cases, the court must look to other components of the intrinsic record in order to decipher the meaning of claim terms.

"The claims, of course, do not stand alone." *Phillips*, 415 F.3d at 1315. "Rather, they are part of a fully integrated written instrument, consisting principally of a specification that concludes with the claims." *Id.* (internal quotation marks and citation omitted). "[T]he specification 'is always highly relevant to the claim construction analysis. Usually it is dispositive; it is the single best guide to the meaning of a disputed term.'" *Id.* (quoting *Vitronics*, 90 F.3d at 1582); *see also Multiform Desiccants, Inc. v. Medzan, Ltd.*, 133 F.3d

6

1473, 1478 (Fed. Cir. 1998) ("The best source for understanding a technical term is the specification from which it arose, informed, as needed, by the prosecution history."). The specification is necessarily helpful in deciphering claim terms because of the statutory directive that the specification describe the claimed invention "in full, clear, concise, and exact terms." 35 U.S.C. § 112; *see also Phillips*, 415 F.3d at 1316.

Because of the specification's instructive nature, the Federal Circuit has "recognize[d] that the specification may reveal a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess. In such cases, the inventor's lexicography governs." *Phillips*, 415 F.3d at 1316.

"In addition to consulting the specification, [the Federal Circuit] [has] held that a court 'should also consider the patent's prosecution history, if it is in evidence.'"[2] *Phillips*, 415 F.3d at 1317 (quoting *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 980 (Fed. Cir. 1995)). The prosecution history is intrinsic evidence and "consists of the complete record of the proceedings before the [Patent and Trademark Office ("PTO")] and includes prior art cited during the examination of the patent." *Id.* (citation omitted). "Yet because the prosecution history represents an ongoing negotiation between the PTO and the applicant,

---

[2] The *Phillips* opinion contains a slight ambiguity as to the circumstances under which a court should consider prosecution history. The quotation reproduced above unqualifiedly states that a court should consider the prosecution history any time it is in evidence. However, earlier in the *Phillips* opinion, when the *en banc* court was describing the role of the specification in claim construction, the court stated that "[u]sually [the specification] is dispositive[,]" and that "[t]he best source for understanding a technical term is the specification from which it arose, informed, *as needed*, by the prosecution history." 415 F.3d at 1315 (emphasis added). When the prosecution history is in evidence but is not needed for claim construction because the specification is dispositive, there is an ambiguity as to whether the prosecution history should be considered. In this case, the prosecution history is useful and is considered.

7

rather than the final product of that negotiation, it often lacks the clarity of the specification and thus is less useful for claim construction purposes." *Id.* (citations omitted). "Nevertheless, the prosecution history can often inform the meaning of the claim language . . . ." *Id.* (citations omitted).

**C.     Extrinsic Evidence**

Extrinsic evidence "'consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises.'" *Phillips*, 415 F.3d at 1317 (quoting *Markman*, 52 F.3d at 980). Even though "it is improper for [district courts] to rely on extrinsic evidence" when the intrinsic evidence is unambiguous, *Applied Signal Tech.*, 2011 WL 500786, at *2, a district court may "[n]onetheless . . . admit and use [extrinsic] evidence" when it would be helpful in "educat[ing] the court regarding the field of the invention" or in "determin[ing] what a person of ordinary skill in the art would understand claim terms to mean[.]" *Phillips*, 415 F.3d at 1319. "In sum, extrinsic evidence may be useful to the court, but it is unlikely to result in a reliable interpretation of patent claim scope unless considered in the context of the intrinsic evidence." *Id.*

### III.  DISCUSSION

The only disputed claim term is "image."[3] Navico proposes that "image" be endowed with "its ordinary and customary meaning," which, according to Navico, is "a visual representation." (Navico's Opening Br. 12.) Johnson Outdoors, on the other hand, proposes a narrower definition: "[A] detailed visual representation of the underwater environment that is produced by sound rather than light." (Johnson Outdoors's Opening Br. 3 (Doc. # 72).) The parties agree that an image is a visual representation. The parties disagree as to whether the visual representation need be (1) produced by sound rather than light, (2) of the underwater environment, and (3) detailed. The first two disagreements will be addressed together, followed by the third.

### A.  "Produced by Sound Rather than Light" and "of the Underwater Environment"

Johnson Outdoors argues that the intrinsic evidence surrounding the use of the claim term "image" reveals that the inventors imported a distinct meaning to the term, using it to refer to visual representations that are produced by sound rather than light and that are of the underwater environment.

In support of its position, Johnson Outdoors first directs the court's attention to claim 1 of the '952 Patent. (Markman Hr'g Tr. 9-10 (Doc. # 91).) With respect to the "produced by sound rather than light" aspect of Johnson Outdoors's proposed construction, the words

---

[3] Navico also contends that claims 10, 11, 12, 13, and 29 of the '203 Patent are non-constructable "because they are indefinite under 35 U.S.C. § 112." (Navico's Opening Br. 20 (Doc. # 71).) Navico's arguments in this regard are better suited for the summary judgment stage, or later. Accordingly, they will not be addressed at this time.

"sonar" and "acoustic" appear thirteen times, one time directly in reference to "a liquid crystal display (LCD) for displaying side scan *sonar images* . . . ." ('952 Patent, 12:49-13:7 (emphasis added); Markman Hr'g Tr. 9-10.)  Johnson Outdoors's argument is that, to a person of ordinary skill in the art, the use of the word "image" in the context of a specification and claims for a sonar imaging system necessarily implies that the "images" referred to therein are created by sound rather than light.  (Johnson Outdoors's Opening Br. 13-14.)

Regarding the second aspect of its proposed claim construction, "of the underwater environment," Johnson Outdoors highlights the language in claim 1 of the '952 Patent referring to "[a] transducer assembly *mounted to a boat*."  ('952 Patent, 12:50) (emphasis added).  Within the transducer assembly are two side scan acoustic elements that produce side scan sonar beams, which are "mounted within the housing and oriented *at a depression angle of between about 20 degrees and about 40 degrees*[.]" ('952 Patent, 12:65-67) (emphasis added).  Because the images are produced from the received return echoes of the acoustic wave beams emitted by these acoustic elements, and because these acoustic elements are mounted on a boat and positioned down into the water and emitting wave beams at the specified depression angle down into the water, Johnson Outdoors argues that a person of ordinary skill in the art of sonar imaging devices would understand the word "image" to contemplate only those images that are "of the underwater environment."  (Markman Hr'g Tr. 10-11.)

10

As part of its broader argument that the claim term "image" should be given its ordinary meaning, Navico argues that the term to be defined is "image," not "sonar image" and not "underwater image." (Markman Hr'g Tr. 28.) Referring back to claim 1 of the '952 Patent, Navico argues that the use of "[t]he modifier 'sonar' in front of the word 'image' necessarily means that not all 'images' are 'sonar images.'" (Def.'s Opening Br. 14 (Doc. # 71).) Navico advances a similar argument regarding the modifier "underwater" before "image." (Def.'s Opening Br. 14-15.) Navico cites *Phillips*, in which the *en banc* court considered the claim term "baffles." The court stated: "To take a simple example, the claim in this case refers to 'steel baffles,' which strongly implies that the term 'baffles' does not inherently mean objects made of steel." 415 F.3d at 1314.

Navico's reliance on this isolated sentence of *Phillips* is misplaced. In the prior sentence, the court stated the principle that "the context in which a term is used in the asserted claim can be highly instructive." *Id*. Context was the primary concern. The fact that the word "steel" was a modifying adjective that, by principles of inclusion, may imply that baffles need not be made of steel, was merely an example of the importance of examining context.

Indeed, the terms "sonar image" and "underwater image" do strongly imply that an image does not inherently mean visual representations produced by sound rather than light or visual representations of the underwater environment. Of course, the word "image," when detached from the context of sonar imaging devices, often refers to visual representations that are not created by sound and that are not of the underwater environment. But in the *context*

11

of these claims for this sonar imaging system, a person of ordinary skill in the art of sonar imaging devices would view the term "image," modified by numerous references to "sonar" and/or "acoustic" and describing how and in which direction the acoustic elements which generate the images are positioned, as referring only to images that are created by sound rather than light, of the underwater environment.

The specifications of the Patents confirm these two aspects of Johnson Outdoors's proposed construction of the term.  In two separate instances, the '952 Patent specification approaches explicitly defining the claim term "image."  Very early in the specification, the inventors disclose a "display device [that] displays *representations of the received echoes, for locating fish and other underwater articles*."  ('952 Patent, 1:31-33) (emphasis added).  The word "image(s)" could, in a contextually cohesive manner, seamlessly replace the italicized text.

Later on in the specification, the inventors disclose that "the sonar return data is communicated . . . to the electronic control head unit for display of *images or symbols representative of the received return echoes of the acoustic wave beams*."  ('952 Patent, 8:6-10) (emphasis added).  This sentence can be read in two ways.  The critical word is "or."  First, a disjunctive reading would signify that the electronic control head unit can display (1) images *or* (2) symbols representative of the received return echoes of the acoustic wave beams.  In the above interpretation, the word "or" is taken in the disjunctive, as contemplating one or the other.  However, and second, the word "or" also has a common definitional usage.  The definitional reading would signify that the electronic control head

12

unit can display images, which are defined as "symbols representative of the received return echoes of the acoustic wave beams." ('952 Patent, 8:8-10.) In other words, the phrase after the "or" defines "images." Looking to the context of the entire specification, this description, if one is to adopt the definitional reading of the sentence, is nearly identical to the first description cited in the preceding paragraph. By contrast, the disjunctive reading would result in a confusing redundancy: "[t]he sonar return data is communicated . . . to the electronic control head unit for display of images or [images]." ('952 Patent, 8:6-10.)

A few sentences down in column 8 of the '952 Patent specification, the "images" described earlier in column 8 are further defined. "The images include a bottom profile, objects along the bottom or in the water (e.g., fish), and the like." ('952 Patent, 8:23-25.) In light of the placement and positioning of the acoustic elements as claimed, and the description in the specifications of what information the images convey, a person of ordinary skill in the art would interpret the term image as being "of the underwater environment."

In sum, the claims themselves, these two sentences from the '952 specification, and the rest of the specifications as a whole reveal "a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess." *Phillips*, 415 F.3d at 1316. The intrinsic evidence contemplates the term "image" as referring to visual representations (1) created by sound rather than light and (2) that are of the underwater environment. Because "[t]he inventor's lexicography governs," *id.*, the court's construction of the claim term "image" will include that the images are produced by sound rather than light and that they are of the underwater environment.

13

**B.    "Detailed"**

The final point of contention is Johnson Outdoors's argument that the intrinsic and extrinsic evidence regarding the claim term "image" reveals that the inventors imported a distinct meaning to the term, using it to refer to visual representations that are "detailed." (Pl.'s Opening Br. 14-17.)

Johnson Outdoors refers principally to columns 5, 6, and 8 of the '952 Patent specification in support of its proposed claim construction. These parts of the specification describe the use of wide and narrow wave beams. The specification states that "[t]he size of the wave front created by the transmitted acoustic beam affects the resolution of the return echo and thus the quality of the imaging of subsurface articles displayed by the sonar device." ('952 Patent, 5:64-66.) "Generally, a wide beam provides diffused return echoes that are particularly suited for indicating the presence of fish in a wide area surrounding the watercraft." ('952 Patent, 5:67-6:3.) "A narrower beam on the other hand provides a more detailed return echo or signal representative of the subsurface article." ('952 Patent, 6:4-6.) A few lines down, the specification continues this teaching: "The narrow beam is useful for providing details of the underwater article or the bottom." ('952 Patent, 6:11-13.) In column 8, the specification states that "the return sonar signal[s] from the bottom [and side] reflection[s] carr[y] details . . . ." ('952 Patent, 8:3-6.) On account of these references in the specification, Johnson Outdoors "submit[s] that the definition of 'image' is clear from the intrinsic record, and should include the explicit requirement that the image is a <u>detailed</u> visual

14

representation." (Pls.' Opening Br. 16) (emphasis in original). Johnson Outdoors's proposed construction will not be adopted for a variety of reasons.

The first reason is that the intrinsic evidence cited by Johnson Outdoors is insufficient to establish the "detailed" prong of Johnson Outdoors's proposed construction. Unlike the prior two prongs of Johnson Outdoors's proposed construction, nothing in the claim language itself supports limiting the definition of "image" to visual representations that are "detailed." Furthermore, the references to "detailed" or "details" in the specification are insufficient to read the limitation into the term "image," and thus the claim language itself. A thorough reading of the referenced portions of columns 5 and 6 reveal that this recitation is merely instructive as to the differing uses of and results conveyed by wide and narrow wave beams. As noted, "[s]pecifications teach. Claims claim." *SRI Int'l*, 775 F.2d at 1121 n.14. To import this teaching into the claim language would be to commit "one of the cardinal sins of patent law – reading a limitation from the written description into the claims[.]" *Phillips*, 415 F.3d at 1320 (quoting *SciMed Life Sys. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1340 (Fed. Cir. 2001)).

The language from column 8 of the '952 specification is equally unhelpful to Johnson Outdoors's proposed construction. This portion of the specification describes how the return sonar signals carry "details" in the form of data that is sent "to the electronic control head unit for display of images . . . ." ('952 Patent, 8:4-8.) Aside from the grammatical differences between nouns and adjectives, the noun "detail" and the adjective "detailed"

15

ascribe different meanings to the ideas they are trying to convey.  Dictionaries[4] suggest that the noun "detail" describes a constituent part of a whole, without making any quantitative assessment.  Webster's Third New International Dictionary 616 (1986) ("a part of a whole"); Am. Heritage Dictionary 494 (4th ed. 2006) ("individual part or item").  On the other hand, the descriptive adjective "detailed" is defined as "marked by *abundant* detail," Webster's Third at 616, or "characterized by *abundant* use of detail," Am. Heritage Dictionary at 494.  The adjective "abundant," used in both dictionaries, expressly contemplates a quantitative assessment.  Webster's Third at 8 ("possessing in great quantity"); Am. Heritage Dictionary 8 ("rich" or "plentiful").  This quantitative distinction is important because it means that use of the noun "details" does not necessarily imply that the sum of the constituent parts, in this case the "image," is, in fact, "detailed."  For example, each pixel of a digital photograph may be described as a "detail" of that digital photograph.  And despite having those "details," the photograph, if of poor quality and low resolution, may not be "detailed."

Navico invokes the doctrine of prosecution disclaimer to support its position that the claim term "image" does not include the limitation that the "image" be "detailed."  The

---

[4] Reference to dictionaries, considered extrinsic evidence when used to construe claim terms, is permissible in this instance.  The terms "detail," "detailed," and "abundant," the dictionary definitions of which the court recites, are not claim terms.  It is "the words of the claims themselves [that] define the scope of the patented invention." *Phillips*, 415 F.3d at 1312 (quoting *Vitronics Corp.*, 90 F.3d at 1582).  Thus, it is only the claim terms themselves to which the court applies the law of claim construction.  Because the dictionary-defined words listed above are not claim terms, the court need not follow the formalized claim construction analysis in elucidating their meaning.  Moreover, as the court finds below, the intrinsic evidence itself does not support Johnson Outdoors's "detailed" prong of its proposed construction of "image."  Thus, even if the analysis used for interpreting claim terms also applies to words in the specification that are not themselves claim terms, consideration of dictionaries as extrinsic evidence would nevertheless be proper in this case because the intrinsic evidence does not sufficiently resolve the meanings of "detail" and "detailed."

prosecution disclaimer doctrine "preclud[es] patentees from recapturing through claim interpretation specific meanings disclaimed during prosecution." *Omega Eng'g v. Raytek Corp*, 334 F.3d 1314, 1323 (Fed. Cir. 2003). To make a showing of prosecution disclaimer, the alleged infringer must show (1) that the patentee cancelled or narrowed the scope of a claim, and (2) that the patentee made an express disclaimer or unambiguous disavowal of the previous claim scope. After the PTO's fourth rejection of Johnson Outdoors's claims, Johnson Outdoors returned with a new set of claims that included a requirement that the images be "camera-like." (Doc. # 71, Ex. E, at 454, 459, 461.) Johnson Outdoors explained that the claims "contain one or more limitations not present in the [previously] rejected claims, which limitations patentably distinguish the pending claims from the prior art of record." (Doc. # 71, Ex. E, at 464.) Among the new limitations was the limitation that the sonar imaging system "generate[ ] camera-like images[.]" (Doc. # 71, Ex. E, at 464.) The PTO Examiner rejected this limitation for several reasons (discussed below); Johnson Outdoors removed the "camera-like" limitation; and a patent was issued. Navico argues that because "Johnson Outdoors accepted the refusal, changed its claims to simply recite the broader and unencumbered term 'image,' and was granted a patent[,]" Johnson Outdoors cannot now "recapture what it earlier gave up." (Navico's Opp'n Br. 9 (Doc. # 76).) Without considering Johnson Outdoors's argument that the prosecution disclaimer doctrine does not apply because Johnson Outdoors, in fact, broadened its claim scope instead of narrowing it, Navico's prosecution disclaimer argument still fails. Navico has failed to point

17

to any express disclaimer or unambiguous disavowal on the part of Johnson Outdoors relating to the "camera-like" limitation.

Prosecution disclaimer aside, the prosecution history on this point still is relevant as intrinsic evidence. The PTO Examiner rejected Johnson Outdoors's claims for two reasons. First, the Examiner stated that "[t]he specification . . . fails to provide any support for the limitation to 'camera-like' images . . . ." (Doc. # 71, Ex. E, at 476-77.) Such is the case presently. The specification fails to provide adequate support for importing "detailed" into the claims through the claim term "image."

Second, the PTO Examiner rejected the "camera-like" limitation on the ground that it was "vague and indefinite." (Doc. # 71, Ex. E, at 476-77.) However, the adjective "detailed" is even more vague and indefinite than "camera-like." "Camera-like" at least conveys the specific idea that the sonar images resemble those types of images that are created by light. The adjective "detailed," with nothing in the intrinsic record that delimits its meaning, conveys nothing but subjectivity. To the eye of the beholder with ordinary skill in the art, a sonar image that does not resemble light-created images could nevertheless be detailed. The court declines to construe a claim term in such a way as to render the claim indefinite.

Finally, the exemplary images themselves, which are part of the specification, do not support Johnson Outdoors's proposed construction. ('952 Patent, Figs. 13-19.) Any particular viewer with ordinary skill in the art may view these images and reach a conclusion different from any other as to whether any, some, or all of these images are "detailed."

18

Because there is nothing in the intrinsic record to support Johnson Outdoors's proposed construction of the claim term "image" as "detailed," the court need not address any extrinsic evidence submitted on this issue.

## IV. CONCLUSION

Accordingly, it is ORDERED that the claim term "image," as it appears in the claims of the Patents in suit, is construed as "a visual representation of the underwater environment produced by sound rather than light."

DONE this 20th day of April, 2011.

            /s/ W. Keith Watkins
            UNITED STATES DISTRICT JUDGE